IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 13, 2002  Session

## JOHN E. SICARD v. LEON WILLIAMS GENERAL CONTRACTOR, INC.

**Direct Appeal from the Circuit Court for Blount County**
**No. L-12944     Hon. W. Dale Young, Circuit Judge**

**FILED JULY 8, 2002**

**No. E2001-02928-COA-R3-CV**

The Trial Court awarded plaintiff commission under Agreement between the parties.  On appeal, we reverse on grounds that plaintiff's misrepresentation in procuring a contract with a third party, denied his contractual right to the commission.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Reversed.**

HERSCHEL PICKENS FRANKS, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

Monty L. Walton and Stephanie K. Hunt, Knoxville, Tennessee, for Appellant.

L. Roy Waldrop, Knoxville, Tennessee, for Appellee.

### OPINION

The issue on appeal in this case is whether the Trial Court erred in enforcing a "Memorandum of Understanding", whereby plaintiff was to be paid a commission based on gross profit for a construction contract he negotiated on Leon Williams General Contractor, Inc.'s ("LWGC") behalf, where the plaintiff's failure to accurately bid the job resulted in a final contract price on the project that could not be performed for the profit recited in the contract.

Plaintiff, an architect, was hired in 1999 by LWGC as its Chief Operating Officer. In addition to his COO duties in construction project management and development, his responsibilities included negotiating and obtaining profitable contracts for LWGC.  If he obtained a construction contract on behalf of the company for a project he either "generated or salvaged", he earned a commission in addition to his base salary.  The percentage of the commission was based upon the gross profit in the contract price.  No commission was earned on projects with a gross profit

percentage less than 5%. The commission percentages are set forth in a Commission Table attached to a "Memorandum of Understanding", drafted by plaintiff and executed by the parties when he commenced his employment. The relative section of the document states with respect to the payment of commissions:

> <u>Which ever occurs first,</u> commission payment will be issued to the incumbent upon receipt of the third payment to the company from the client, or within sixty days, following a signed construction agreement, on a standard project. The same will apply following the execution of the Phase 2, "For Construction" agreement on a design-build contract.

LWGC had initiated negotiations in the Spring of 2000 with New Hope Baptist Church for construction of a new church and fellowship hall, but had been unsuccessful. Plaintiff resumed these negotiations with the church building committee at some point, providing them with proposed documents called "trend reports" which are documents in spreadsheet form that show a breakdown of the various costs involved with the project and the total contract price. He prepared these trend reports based upon figures provided to him by an estimator employed by LWGC, compiled from reports called "base bid summaries". Base bid summaries go into much more explicit breakdown for the specific costs underlying the major categories listed in the trend reports.

The first proposal to the building committee showed a total contract cost of $1,707,015.00 and recited a contractor's profit and overhead of $136,540.00. The trend report dated July 24, 2000, also reflects that the cost of the pews and the special lighting/sound system were "NIC" or "not in contract" and are to be owner-furnished, estimated to be $50,000.00 each. It is not disputed that the estimator did not prepare an estimate for these items, and was never requested to do so by plaintiff. The church building committee rejected this figure and requested a total contract budget of $1,377,000.00 that also included the pews and sound system.

After further negotiations, the contract for $1,388,046.00 was signed between New Hope Baptist Church and LWGC dated as of August 25, 2000. The final contract incorporates by reference the trend report dated August 7, 2000, and the reference to the pews and sound system is deleted from the "owner furnished" section, but the remarks line at the Total Project Cost line states: "Turn-key incl'g. new & redone pews, sound system & bridge." The meeting minutes of August 31, 2000 reflect that "various points of the contract were reviewed including the attachments and scope of the work. There were no questions and the church's plan is to present the contract to the bank on Friday, September the first."

Plaintiff initially testified that he did not tell the committee that the cost of the pews and sound system were included in the final contract price, but recanted this testimony on cross-examination. The project manager and the architect on the project testified that plaintiff did in fact represent to the committee that the final price did include these items. Neither the August 7 trend report nor the underlying base bid summary, provide for any cost allocation for these items. However, the contract shows a projected profit of $121,796.00.

Plaintiff left the employment with LWGC in October of 2000. LWGC contends on appeal that due to plaintiff's errors and failure to adequately bid the New Hope project by not allocating any cost for the pews and sound system, resulted in its inability to build a church for the contracted price, and LWGC ultimately was allowed not to perform the contract. It is defendant's contention that plaintiff, by failing to allocate an additional $100,000.00 in costs for the pews and sound system in the August 7, 2000 trend report and thus in the final contract, the project was not profitable at all. In essence, it claims that the contract's real profit was not $121,796.00 as shown on the trend report, but only $21,796.00 or 1.5%. Accordingly, it should not be bound to pay the commission per the terms of the Memorandum of Understanding ("MOA") on the unprofitable contract.

Plaintiff essentially argues that the Trial Court properly interpreted the Memorandum of Understanding and insists the forecast gross profit was specified in the contract and plaintiff's commission was clearly due, based upon the forecasted profit, since the intent of the Memorandum of Understanding was to use the gross profit specified. LWGC was to pay plaintiff within a specified time, all of which demonstrates that the intent of the contract was to base the payment on the projected gross, rather than any actual profits that might be realized under the contract.

In this case, the language of the MOA is clear and unambiguous and the Trial Court properly interpreted the intent of the parties to this agreement. *See, Taylor v. White Stores, Inc.*, 707 S.W.2d 514, 516 (Tenn. Ct. App. 1985). However, the Trial Court pretermitted the issue of plaintiff's negligence in negotiating the contract with the church.

Plaintiff prepared the document the church and LWGC relied upon in the Agreement of August 25. The plaintiff testified:

Q.      Okay, and during this meeting on July the 24th, one of the comments made under the review of the trend report is that the committee was under the impression that the original proposal would include the sound system and the church pews. Do you see that comment?

A.      Yes, I do.

Q.      And as far as the responsibility for clarifying that item, it lists your name; is that correct?

A.      Yes, yes. . . .

. . .

Q.      Let me show you what has been premarked as Exhibit 3 in this case, Mr. Sicard. Do you recognize that document?

-3-

A.      Yes, sir.

Q.      Is that a trend report that you prepared?

A.      Yes, it is.  This is my last meeting with the church committee.

. . .

Q.      Okay.  There's still no cost figures in that report for the pews or the sound
        system, are there?

A.      Only in the forecast.

Q.      Well, the forecast is the project cost, plus the $50,000 contingency, plus the
        bridge; isn't that right?

A.      That's right.

Q.      Okay.  So where are the pews and the sound system in your forecast?

A.      I don't recall.

Q.      And you can't find them sitting here today by looking at that report, can you?

A.      No, I can't.

. . .

Q.      Okay.  Well, they're not – the hundred thousand dollars for the pews and the
        sound system aren't anywhere in that trend report that you can identify, are
        they?

A.      No, sir.

Q.      But it is represented that this scope of work there would include that work,
        isn't it?

A.      Yes, it does.

Plaintiff had a duty to LWGC to be careful, skillful, diligent and loyal in the performance of
LWGC's business.  *See Gay & Taylor, Inc., v. American Gas Co. of Reading, PA.,* 381 S.W.2d 304
(Tenn. Ct. App. 1963).  The record establishes that plaintiff was negligent in negotiating the contract
on behalf of LWGC, which was unprofitable for the company.  His misrepresentations ultimately

caused the termination of the contract. The enforcement of all contracts are tempered by equity and good conscience, and it is appropriate to deny plaintiff any recovery on this contract, either in law or equity, based upon his negligence in negotiating the contract. A familiar equitable maxim holds that no one should profit from his own wrong.

Accordingly, we reverse the Judgment of the Trial Court and remand, with the cost of the appeal assessed to plaintiff, John E. Sicard.

_____
HERSCHEL PICKENS FRANKS, J.